UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

COCONUT CREEK GAMING, L.P.,
a Delaware limited partnership,

Plaintiff,

vs.

SEMINOLE TRIBE OF FLORIDA,
a federally recognized Indian Tribe,

Defendant.

_____/

CASE NO. 02-61442-CIV
DIMITROULEAS

MAGISTRATE JUDGE: SELTZER

NIGHT BOX
FILED
FEB 26 2003
CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## PLAINTIFF'S RENEWED MOTION TO APPOINT A CUSTODIAN

Plaintiff, Coconut Creek Gaming, L.P., a Delaware limited partnership ("Plaintiff" or "Partnership"), through undersigned counsel, hereby moves for the appointment of a custodian to segregate and account for the Pledged Revenues, as hereinafter defined, of the Coconut Creek gaming facility (the "Gaming Facility") owned and operated by the Seminole Tribe of Florida (the "Tribe" or "Defendant"), and as grounds therefor states the following:

### I.      Facts

### A.      Agreements

1.      On September 10, 1999, Plaintiff and Defendant entered into a series of agreements (the "Original Agreements") pursuant to which Plaintiff agreed to: (a) construct and develop the Gaming Facility for the Tribe pursuant to the Tribe's plans and designs; (b) purchase all of the furniture, fixtures and equipment necessary for the operation of the Gaming Facility pursuant to and in accordance

with the Tribe's specific instructions; (c) lease the same to the Tribe; and (d) fund the startup expenses associated with the operation of the Gaming Facility. Plaintiff placed more than $20,000,000 of its own funds at risk on behalf of Defendant.

2.    On June 3, 2000, Plaintiff and Defendant entered into a series of "substitute" agreements which superceded and entirely replaced the Original Agreements (the "Substitute Agreements"). (The Original Agreements and the Substitute Agreements are hereinafter collectively referred to as the "Agreements.") The Substitute Agreements are virtually identical to the Original Agreements but for minor, non-substantive modifications. [1]

3.    In light of the significant risk assumed by Plaintiff in connection with the Agreements, Defendant agreed to repay Plaintiff the full amount of its investment plus interest upon the opening of the Gaming Facility through monthly base rent ("Base Rent") payments and thereafter agreed to pay Plaintiff 35% of the net revenues generated by the operation of the Gaming Facility ("Incentive Rent") for a period of ten years commencing the first month after the Base Rent payments were completed. See Sections 4.1, 4.3 and 4.4 of the Substitute Phase I Structure and Equipment Lease dated June 3, 2000 by and between Plaintiff and Defendant (the "Substitute Phase I Lease"), a copy of which is attached as Exhibit "C" to the Exhibit Register filed with the Complaint herein on October 11, 2002.[2]

---

[1] On or about March 20, 2001, Plaintiff and Defendant entered into the First Addendum to the Substitute Transaction Documents, which amended the Agreements. The First Addendum does not contain substantive changes to the Substitute Transaction Documents that would affect the relief sought by this Motion.

[2] At the inception of this case, Plaintiff filed its "Notice of Filing Exhibits and Exhibit Register" attaching an exhibit register (the "Exhibit Register") to be used in connection with its Complaint for

4.     As security for Defendant's obligations to repay Plaintiff the Base Rent and Incentive Rent under the terms of the Substitute Phase I Lease, Defendant granted Plaintiff a security interest in the Pledged Revenues.[3] See Section 4.5 of the Substitute Phase I Lease and Section 2.1 of the CMA, as defined below, a copy of which is attached as Exhibit "D" to the Exhibit Register. In the event of a default by the Tribe, Plaintiff's only true recourse is to pursue the Pledged Revenues of the Gaming Facility. See Section 14.6 of the Substitute Phase I Lease. The Substitute Phase I Lease explicitly precludes the use of any other tribal assets to satisfy a judgment against the Tribe resulting from the Tribe's breach of the Agreements.

5.     In addition, to ensure that Defendant properly accounted for the Pledged Revenues and to ensure that Defendant did not commingle the Pledged Revenues with revenues from any other sources, Plaintiff and Defendant executed a Substitute Cash Management Agreement on June 3, 2000 (the "CMA"). The CMA provides for the establishment of a series of accounts (the "Cash Management Accounts") into which Defendant was required to deposit Pledged Revenues from the operation of the Gaming Facility on a daily basis. Compliance with the CMA was essential to protect Plaintiff's security interest and other rights in the Pledged Revenues. See Affidavit of Alan H. Ginsburg, a copy of which is attached to the Exhibit Register as Exhibit "K."

---

Damages and Accounting (the "Complaint").  All exhibits attached to the Exhibit Register are incorporated herein by reference.

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Substitute Master Definitions List attached to the Exhibit Register as Exhibit "F".

### B.    Breaches of the Agreements

6.    Although Plaintiff complied with all of its obligations under the Agreements, and in so doing, placed in excess of $20,000,000 at risk, Defendant breached its obligations under the Agreements.  These breaches are set forth in detail in both the Complaint and the Affidavit of Alan H. Ginsburg.  They include, without limitation:

a.    failure to pay any Incentive Rent under the Substitute Phase I Lease since June, 2002, in an amount believed to be in excess of $15,000,000 as of the date hereof;

b.    improper overstatement of operating expenses in the approximate amount of $5,800,000, and the consequent underpayment of Incentive Rent in the approximate amount of $1,750,000, during the period Defendant did make Incentive Rent payments.[4]  Its overstatement of expenses included internally leasing the Gaming Facility back to itself, thereby artificially inflating operating expenses by $5,000,000 plus payment of $800,000 to an insider for "water rights" associated with  real property owned by that insider;

c.    failure to comply with Plaintiff's request to review Defendant's books and records in connection with the Gaming Facility as well as the Tribe's other gaming facilities to ensure that funds from the Gaming Facility have not been commingled;

---

[4] Defendant failed to pay the June Incentive Rent payment, due on July 25, 2002, but had it made this payment, the Defendant would have underpaid the Incentive Rent due by an additional $280,000.

      d.    failure to provide Plaintiff with Operating Expense Budgets, Capital Reserve Budgets and various other financial reports as required under the terms of the Agreements; and

      e.    failure to establish Cash Management Accounts as required by the CMA, thereby placing at risk the Pledged Revenues subject to Plaintiff's security interest.

7.    In accordance with the terms of the Substitute Phase I Lease, on or about August 19, 2002, Plaintiff served a letter on Defendant scheduling a meeting on August 22, 2002 at the law offices of Broad & Cassel in Fort Lauderdale, Florida (the "August 19 Letter"). A true and correct copy of the August 19 Letter is attached to the Exhibit Register as Exhibit "H."

8.    Despite Plaintiff's request for a meeting, Defendant failed to appear at the requested date and time and did not even extend the courtesy of notifying Plaintiff that it would not attend the meeting. See Affidavit of Alan H. Ginsburg.

9.    On August 27, 2002, Plaintiff forwarded a second letter to Defendant giving the Tribe another opportunity to schedule a meeting in an effort to resolve all disputes and avoid the necessity of serving a default letter (the "August 27 Letter"). A true and correct copy of the August 27 Letter is attached to the Exhibit Register as Exhibit "I."

10.    Again, Defendant ignored Plaintiff's request.

11.    As a result, in accordance with the terms of the Substitute Phase I Lease, on or about August 30, 2002, Plaintiff served a letter advising Defendant of the defaults under the Substitute Phase I Lease and CMA, and reminding

Defendant of the thirty-day time period to cure said defaults (the "August 30 Letter"). A true and correct copy of the August 30 Letter is attached to the Exhibit Register as Exhibit "J."

12.    Defendant did not respond to the August 30 Letter and did not make any effort to cure any of its many and varied defaults under the Substitute Phase I Lease or the CMA. See Affidavit of Alan H. Ginsburg.

13.    Accordingly, on or about October 11, 2002, Plaintiff was compelled to file its complaint commencing the instant litigation.

## C. Cash Mismanagement by Tribe

14.    The Tribe's cash management policies are in a state of disarray and thereby seriously jeopardize the Pledged Revenues subject to Plaintiff's security interest.

### Testimony of Secretary/Treasurer of the Tribe

15.    For more than 22 years, Priscilla D. Sayen ("Sayen") has been the secretary/treasurer of the Tribe. This is the equivalent of an officer's position for the Tribe. Sayen remains in that position today. As secretary/treasurer, Sayen is responsible for maintaining the books and records of the Tribe, including resolutions and ordinances passed by the Tribe, and preparing the minutes of Tribal Council meetings. See pp. 7-8 of the deposition transcript of Sayen taken in connection with the case styled Seminole Tribe of Florida v. James E. Billie and Timmy Wayne Cox, (the "Billie Litigation") currently pending before the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. 01-

021201 (the "Sayen Deposition Transcript"). A true and correct copy of the Sayen Deposition Transcript is attached to the Exhibit Register as Exhibit "O".

16. As secretary/treasurer of the Tribe, Sayen is also responsible for ensuring compliance with Article V, Section 5 of the Tribal Constitution and Bylaws, which provides that, before disbursements of Tribal funds are made, a written resolution must be duly enacted by the Tribal Council authorizing the disbursement. See pp. 23-24 and 50 of the Sayen Deposition Transcript and Article V, Section 5 of the Tribal Constitution and Bylaws attached to the Exhibit Register as Exhibit "L".

17. Notwithstanding the provisions of the Tribal Constitution and Bylaws, Sayen regularly makes disbursements to both members and non-members of the Tribe in the absence of a duly enacted written resolution, and she rarely denies or even questions requests for disbursements when such requests are not authorized by written resolution. See, e.g., pp. 15-16, 18-20, 22-24, 47, 52-53, 140-142, 181-184, 212 and 289-291 of the Sayen Deposition Transcript.

18. Sayen further testified that she regularly approves requisition requests without appropriate documentary support for such requests. See p. 47 of the Sayen Deposition Transcript. This testimony reflects not only Ms. Sayen's failure to follow Tribal policy, but also her failure to adhere to simple, routine cash management procedures.

19. Perhaps the most egregious example of the Tribe's cash mismanagement and failure to follow Tribal policy is Sayen's disbursement of

*$12,000,000* to Big Cypress Reservation[5] ("BCR") during Fiscal Year 2002 even though the annual budget for BCR was only *$5,000,000* for that particular fiscal year. See pp. 18-20 of the Sayen Deposition Transcript. The Tribal Council did not pass any written resolutions authorizing $7,000,000 in additional disbursements, but Sayen nevertheless made the additional disbursements at the request of David Cypress, a Tribal Council member. See p.19 of the Sayen Deposition Transcript.

20. The cash mismanagement and fiscal irresponsibility are not limited to the actions of the secretary/treasurer.

## Testimony of Controller of Tribe

21. Suresh Greer is the Tribe's controller responsible for issuing the actual disbursements requested by the Tribal Council members and for managing the accounting and finance department of the Tribe. Mr. Greer recently testified during his deposition in the Billie Litigation that:

a. he has neither formal training in the Tribe's established internal cash management procedures nor any knowledge of a formalized written policy and procedure for accounting practices within the Tribe. See pp. 7, 9-12, 21-23, 34-35 and 57-60 of the deposition transcript of Suresh Greer, in the Billie Litigation, (the "Greer Deposition Transcript"), attached to the Exhibit Register as Exhibit "P";

---

[5] Big Cypress Reservation is one of the Indian Reservations, the title to which is held by the United States in trust for the Seminole Tribe of Florida. See Article I of the Tribal Constitution and Bylaws.

b.     he is unfamiliar with any restrictions imposed by the Tribal Constitution and Bylaws upon distributions to Tribal members. See pp. 26-27 and 30-31 of the Greer Deposition Transcript;

c.     he regularly approves disbursements to Tribal Council members in the absence of the requisite written resolutions, neither reviews nor supervises the review of requisitions and has virtually never denied disbursement requests of Tribal Council members. See pp. 25 and 53-55 of the Greer Deposition Transcript;

d.     he regularly makes disbursements to Tribal Council members without confirming whether such disbursements are within allocated annual budgets and/or knowing that the Tribal Council member is over-budget. See, e.g., pp. 62-64 of the Greer Deposition Transcript; and

e.     he has further been instructed by members of the Tribal Council to make disbursements to certain Tribal Council members without following the Tribe's established internal cash management procedures. See pp. 46-49 of the Greer Deposition Transcript.

### Testimony of Tribal Councilman, David Cypress

22.     The recent testimony of David Cypress ("Cypress"), a member of the Tribal Council, at a criminal trial of former administrators of the Tribe pending before the United States District Court for the Southern District of Florida, highlights the severity of the Tribe's cash mismanagement and the potential resulting diminution to Plaintiff's collateral.

23.    On December 4, 2002, in the case styled <u>United States of America,</u>
<u>Plaintiff, v. Danny Wisher, Timmy Cox, Michael Crumpton, Defendants</u>, Case No.
02-60111-CR-WPD (the "Criminal Trial"), Cypress testified that:

      a. during the past 3 ½ years, he spent over $57,000,000 of the Tribe's
money, even though his allocation during that period was only
$5,000,000 per year (or $17,500,000). <u>See</u>, <u>e.g.</u>, p. 118, lines 6-12
and p. 119, lines 13-21, of the December 4, 2002 transcript of the
Criminal Trial (the "Trial Transcript"), a true and correct copy of
which is attached hereto as Exhibit "A";

      b. the Big Cypress Reservation, which he represents, and on whom he
is entitled to spend his $5,000,000 annual allocation, consists of
only 200 to 300 homes, although he could not remember exactly
how many homes are on the Big Cypress Reservation. <u>See</u> p. 118,
lines 13-25;

      c. the $57,000,000 he spent over said 3 ½ year period was comprised
of, among other things:

            (i)    over   $5,800,000   to   Nationwide   Landscaping,   a
landscaping company owned by the fiancée of Krishna
Lawrence, a close business associate of Cypress.  <u>See</u>
p. 125, line 3 through p. 126, line 8, and p. 128,
lines 21 -25 of the Trial Transcript.  The landscaping
was for a total of 32 homes during the 3 ½ year period,
but  Cypress  did  not  believe  that  this  figure  was

10

outrageous.   See p. 128, lines 1-12 of the Trial Transcript;

(ii)   $1,219,000 directly to Krishna Lawrence, individually. See p. 131, lines 16-18 of the Trial Transcript;

(iii)   $613,000 to Sontino Dicarlo for landscaping. See p. 133, lines 15-20 of the Trial Transcript;

(iv)   $1,629,000 to Michael's Decoration for home decorating. See p. 143, lines 1-5 of the Trial Transcript;

(v)   $594,000 to Hendry County Motors for car repairs. See p. 145, lines 2-8 of the Trial Transcript;

(vi)   $350,000 to himself to purchase a boxing gym. See p. 139, lines 20-24 of the Trial Transcript;

(vii)   Hundreds of thousands of dollars on Cadillacs, Lexuses, BMW'S, Mercedes, Volkswagons and Harley Davidsons, for anyone who wanted one, and for people whose names he cannot even remember. See p. 138, lines 7-9; p. 149, line 20 through p. 151, line 7; and p. 153, lines 18-21 of the Trial Transcript. The sheer absurdity of Cypress' spending on luxury cars was illustrated by his comment: "I bought [a car] for ...whoever wants [one]..., you know, give me a sad Hank Williams song, I will give you one." See p. 138, lines 8-14 of the Trial Transcript;

11

(viii)  Drugs and alcohol, <u>see</u> p. 140, lines 14-18 of the Trial Transcript; and

(ix)  $213,000 to a lawyer to handle primarily DUI matters for tribal members.  <u>See</u> p. 153, lines 1-13 of the Trial Transcript;

d.  he does not bother to check to see if the invoices that he pays are valid or reasonable.  <u>See</u> p. 144, lines 13-22 and p. 160, lines 15-21 of the Trial Transcript;

e.  the $57,000,000 was insufficient to handle all of the tribal members that approached him regularly.  <u>See</u> p. 157, lines 2-6 of the Trial Transcript; and

f.  there were no rules, or other checks and balances, to stop him from spending the Tribe's money on anything he wanted, and if someone wanted something, they would just ask him for it, and he would get it for them.  <u>See</u>, <u>e.g.</u>, p. 90, line 13 through p. 91, line 3; p. 123, lines 21-24; p. 163, lines 1-6; and p. 166, lines 1-11 of the Trial Transcript.

24.    Perhaps most troubling for Plaintiff is Cypress' testimony that he wanted to enjoy this "spending spree…forever, if possible," <u>see</u> p. 179, lines 12-17 of the Trial Transcript coupled with his testimony that he "recognized that gaming is the bloodline for the cash which supports the spending spree." <u>See</u> p. 99, lines 7-10 of the Trial Transcript.

### D.    Risk of Closure of Gaming Facility

25.    Heightening the risk to Plaintiff is the realistic threat of closure of the Gaming Facility.

26.    In its Answer and Affirmative Defenses to the Complaint, the Tribe suggests that by entering into the Agreements with Plaintiff, the Tribe may have violated certain provisions of Title 25 of the United States Code, including 25 U.S.C. §2710(b)(2)(A). Although Plaintiff disagrees with the Tribe's position, the Tribe has suggested in pleadings filed with this Court that the National Indian Gaming Commission (the "NIGC") could close down the Gaming Facility as a result of such failure to comply with this statute.[6]

27.    Assuming Plaintiff is correct, and the NIGC does not have grounds to close the Gaming Facility, the Tribe itself could voluntarily decide to close the Gaming Facility. In or around April, 2002, shortly before the Tribe stopped making the Incentive Rent payments under the terms of the Agreements, the Tribe closed on the issuance (the "Bond Issuance") of approximately $290,000,000 in revenue bonds (the "Bonds") to construct Hard Rock Café resorts and casinos in Hollywood and Tampa. The Hard Rock Café resort and casino to be built in Hollywood, Florida will be referred to herein as the "Hollywood Hard Rock."

28.    As part of the Bond Issuance, the Tribe pledged all of its assets, other than the Pledged Revenues of the Gaming Facility, as security for the repayment of

---

[6] The Tribe has suggested that the Agreements are invalid because they do not comply with this particular statute. In fact, the Agreements themselves would not be rendered invalid by virtue of 25 U.S.C. §2710(b)(2)(A). Instead, the Tribe would be deemed to be in violation of this provision, and the NIGC could theoretically close the Gaming Facility based upon the Tribe's own failure to comply with this statute.

the Bonds.  A true and correct copy of the U.C.C. Financing Statements reflecting this pledge of assets is attached hereto as Composite Exhibit "B."

29.     The Tribe's decision to stop paying Plaintiff the Incentive Rent at or about the time that the Tribe closed on the Bond Issuance may not be coincidental. As reflected on the excerpt from the Private Placement Offering for the Bond Issuance, a copy of which is attached hereto as Exhibit "C," the Tribe has certain construction commitments which must be funded from Tribal revenues and not from the bond proceeds.

30.     Given the proximity between the site of the Hollywood Hard Rock and the Gaming Facility, Plaintiff is concerned that the Tribe will stall this litigation until the Hollywood Hard Rock is opened.  At that time, the Tribe could voluntarily close the Gaming Facility to avoid paying any judgment to Plaintiff.  If the Tribe were to close the Gaming Facility, Plaintiff's ability to collect the Pledged Revenues would be lost forever unless the Court requires the Tribe to immediately segregate the Pledged Revenues.

31.     Plaintiff's concerns are well-founded given the delay tactics employed by the Tribe to date in this litigation.  In particular, on December 6, 2002, the Tribe filed a motion to stay (the "Stay Motion") the instant proceedings purportedly to provide certain government agencies[7] an opportunity to undertake "final agency action" with respect to the Agreements.  The Tribe recommends that the stay remain

---

[7] The government agencies are the National Indian Gaming Commission and the Bureau of Indian Affairs.

in effect for a "reasonable" time, which it believes to be no less than six months from January 2003, or through June 6, 2003.

32.    The Stay Motion, however, ignores the crucial fact that the Original Agreements were submitted to and reviewed by both the NIGC and the BIA.  See the copy of the January 7, 2000 letter to Penny Coleman attached hereto as Exhibit "D" and the February 3, 2000 letter from Franklin Keel to attached hereto as Exhibit "E." The NIGC concluded that the Original Agreements did not contain terms for management and after monitoring the parties implementation of those Agreements, has never brought an enforcement action against either the Tribe or Plaintiff contending the Agreements were void as an unapproved management agreement.  See a copy of the January 24, 2000 letter from Penny Coleman to James Billie attached hereto as Exhibit "F."  The BIA reviewed the Original Agreements and advised the Tribe and Plaintiff that BIA approval of the Agreements was not required.  See copies of the affidavits of Timothy Cox and Ron Padgett, attached hereto as Exhibits "G" and "H" respectively.

33.    The Substitute Agreements, which are virtually identical to the Original Agreements, were submitted to and reviewed by the NIGC as well.  See copies of the affidavits of Timothy Cox and Ron Padgett, attached hereto as Exhibits "G" and "H" respectively.

34.    The NIGC advised the Tribe that since the Substitute Agreements were identical to the Original Agreements, the NIGC's January 24, 2000 letter remained the Commission's official position on the Agreements.  The Stay Motion is thus another request by the Tribe for the NIGC and the BIA to review documents

which both agencies have previously reviewed and concluded do not require agency approval. As such, the Stay Motion is nothing more than a thinly veiled attempt to delay the instant action and the Tribe's compliance with its obligations under the Agreements.

35.    Notwithstanding its purported basis for filing the Stay Motion, the Tribe represented and warranted in the Agreements that: (a) "[n]o consent, approval . . . or notice to any federal or state regulatory authority, the BIA or any third party is required in connection with the making or performance of the [Substitute Agreements]; or if so required . . . has been requested and/or obtained, or will be requested within five (5) business days of the Execution Date . . . ." See Substitute Phase I Lease, § 12.1; and (b) "[it] shall seek . . . approval [of the Substitute Agreements] from the NIGC immediately after the Execution Date." See Substitute Phase I Lease, § 11.3.   Given these representations and warranties, the Tribe's true motive in filing the Stay Motion is clear, namely to delay this proceeding.

36.    As noted, the Tribe pledged all of its assets other than the Pledged Revenues to secure repayment of the Bonds. In addition, among Plaintiff's limited remedies against the Tribe in the event of a default under the Agreements is to pursue its rights in and to the Pledged Revenues. See Articles 4 and 13 of the Substitute Phase I Lease. If the Tribe is not required to immediately segregate the Pledged Revenues, the Plaintiff could be left without an effective remedy in the event it prevails in this litigation, particularly if the Gaming Facility is closed.

## II.   Legal Bases for Relief Requested

### A.   Contractual Basis

37.   The remedy provisions of the Agreements provide for the judicial appointment of a custodian in the event of a default by the Defendant under the Agreements. See Section 13.2 of the Substitute Phase I Lease and Section 5.2 of the CMA. The primary purpose of these provisions is to perfect and protect the Plaintiff's interest in the Pledged Revenues. See Affidavit of Alan H. Ginsburg.

38.   Based on the Defendant's breaches of the Agreements described above, Plaintiff is entitled to the appointment of a custodian as requested by this Motion under the remedy provisions of the Agreements alone.

### B.   Common Law Basis

### Appointment of Traditional Receiver

39.   In addition, under common law, Plaintiff is entitled to the appointment of a receiver independent of the remedy provisions of the Agreements.

40.   The appointment of a receiver is within the sound discretion of the court. Santibanez, M.D. v. Weir McMahon & Co., 405 F.3d 234, 241 (5th Cir. 1997); Consolidated Rail Corp. v. Fore River Railway Co., 861 F.2d 322, 326 (1st Cir. 1988); Recarey v. Rader, 320 So. 2d 28, 29 (Fla. 3rd DCA 1975); Insurance Management, Inc. v. McLeod, 194 So. 2d 16, 18 (Fla. 3rd DCA 1967). Courts consider various factors in deciding whether to appoint a receiver including: the probability that fraudulent conduct has occurred or will occur to frustrate the claim; imminent danger that property will be lost, concealed or diminished in value; and whether the appointment of a receiver will do more harm than good." Meyer Jewelry Company v.

17

Meyer Holdings, Inc., 906 F. Supp. 428, 432 (E.D. Mich. 1995); see also Santibanez, ,
405 F.3d at 241-242; Consolidated Rail Corp., 861 F.2d at 326-327; Bookout v. Atlas
Financial Corp., 395 F. Supp. 1338, 1343 (N.D. Ga. 1974).

41.    A receiver is typically appointed to "take control, custody, or
management of property that is involved in litigation or is likely to become involved
in litigation . . . ." Sterling v. Stewart, 158 F.3d 1199, 1201 (11th Cir. 1998).
Accordingly, a receiver's duties include the preservation of the subject property and
protection of the parties' rights pending the outcome of the underlying litigation.
Insurance Management, 194 So. 2d. at 18.

42.    In the case at bar, Plaintiff has demonstrated its entitlement to the
appointment of a traditional receiver through the exhibits contained in the Exhibit
Register as well as those exhibits attached hereto.

43.    Indeed, even while the Tribe made Incentive Rent payments to
Plaintiff, it neither properly accounted for the Pledged Revenues nor segregated
them as required by the Agreements.  Moreover, once it ceased making Incentive
Rent payments, the Tribe did not respond to repeated requests by Plaintiff for an
accounting or to meet to discuss the Tribe's failure to comply with the Agreements.

44.    The testimony of Sayen, the Tribe's secretary/treasurer, and Greer, the
Tribe's controller, reflect the Tribe's total lack of internal cash controls and utter
disregard for the requisition procedures mandated by the Tribe's own Constitution
and Bylaws.  The testimony of David Cypress at the Criminal Trial not only
corroborates the Tribe's fiscal irresponsibility but embarrassingly highlights its
penchant for spending millions of dollars weekly on luxury items as well as its

unwillingness to curtail its spendthrift habits.   As previously discussed, this reprehensible state of affairs alone jeopardizes Plaintiff's collateral and the need for an independent third party to account for and segregate the Pledged Revenues.

45.   The risk of closure of the Gaming Facility further increases Plaintiff's risk, thereby rendering the appointment of a receiver all the more exigent.   The Tribe's own pleadings suggest that closure of the Gaming Facility by the NIGC is a possibility.   A more likely scenario, however, is that upon the completion of the Hollywood Hard Rock, which may coincide with the trial of this litigation, the Tribe may simply close the Gaming Facility, particularly if confronted with a substantial judgment.   Under that scenario, Plaintiff would be left without an adequate legal or equitable remedy.   In the absence of a court appointed custodian to account for and segregate the Pledged Revenues, the Tribe could expend most, if not all, of the Pledged Revenues with absolutely no accountability to Plaintiff or the Court.   The prejudice, if any, imposed upon the Tribe upon the appointment of a custodian for this limited purpose pales in comparison to the substantial harm that would befall Plaintiff if it ultimately prevails in this litigation but is stripped of any recovery. That would result in a pyrrhic victory at best.

46.   Under the circumstances, the Court is well within its discretion to appoint a traditional receiver.

### **Appointment of Common Law Custodian**

47.    Notably, Plaintiff does not seek the appointment of a traditional receiver with management authority, but rather seeks the appointment of a custodian to account for and segregate the Pledged Revenues pending the outcome of this litigation.  Accordingly, the standards for appointment of the custodian sought herein should be far less stringent than the standards typically applied to litigation involving the appointment of a traditional receiver.

48.    In <u>Ashemimry v. Ba Nafa</u>, 778 So. 2d 495, 498 (Fla. 5th DCA 2001), the Court held that appointment of a custodian with primarily accounting functions is appropriate where there is a fiduciary relationship between two parties and the party requesting the appointment of the custodian has invested a large amount of money with the party over whom the custodian would be appointed.

49.    Here, Plaintiff expended over $20,000,000 in fulfilling its obligations under the Agreements.  The Tribe had a fiduciary duty to Plaintiff to, among other things, account for and segregate the Pledged Revenues under the terms of the CMA.  The appointment of a custodian to segregate and account for the Pledged Revenues is therefore warranted.

### III.    **Conclusion**

50.    The appointment of a custodian to account for and segregate the Pledged Revenues is appropriate under: (i) the express terms of the Agreements; (ii) common law standards for the appointment of a traditional receiver; and (iii) common law standards for the appointment of a custodian.

51.     As reflected above, the appointment of a custodian is essential to the protection of the Pledged Revenues.   When it was making the Incentive Rent payments to Plaintiff, the Tribe did not adequately account for the Pledged Revenues or segregate them as required under the CMA.  Since June, 2002, the Tribe has not made any Incentive Rent payments, rendering its failure to account for and segregate the Pledged Revenues is perilous to Plaintiff.   The peril is ominous given the Tribe's complete lack of internal cash management controls, its penchant for spending millions of dollars weekly on luxury items and its unwillingness to curtail its lavish spending habits.  This peril is heightened when viewed in the context of a possible closure of the Gaming Facility.  The opening of the Hollywood Hard Rock could well provide the Tribe with all the incentive it needs to close the Gaming Facility, particularly if a judgment is rendered against it for hundreds of millions dollars.

52.     While the appointment of a custodian to segregate and account for the Pledged Revenues would provide a meaningful and necessary benefit to Plaintiff, and one which was contractually bargained for, the appointment would result in little, if any, disruption to the operations of the Gaming Facility and would not otherwise unduly prejudice the Tribe.   The custodian would not assume any managerial or operational responsibilities over the Gaming Facility.  As delineated above, the custodian would primarily serve an accounting function.  The custodian could provide an unbiased assessment of the amounts owed to the Plaintiff under the Agreements and would ensure that the rights of both parties are protected pending an adjudication of the merits.  Finally, the custodian would not disburse

any funds, other than the normal, approved operating expenses, to either Plaintiff or Defendant, but would instead ensure that the Pledged Revenues are deposited into the accounts required by the CMA until the litigation is resolved.

**WHEREFORE**, Plaintiff respectfully requests the entry of an Order appointing a custodian to: provide an accounting of the Tribe's operating expenses at the Gaming Facility as compared to the Tribe's other casinos; review the Tribe's books and records and particularly those revealing what happened to the net revenues generated by the Gaming Facility since February 2000; segregate all net revenues going forward nunc pro tunc from June 2002 when the Tribe ceased all Incentive Rent payments to Plaintiff; maintain Cash Management Accounts consistent with the terms of the CMA for all net operating revenues; and for such other and further relief as the Court deems just and proper.

GENERAL JURISDICTION DIVISION
CASE NO. 02-61442-CIV DIMITROULEAS

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by regular U.S. Mail to Donald A. Orlovsky, Esq., Kamen & Orlovsky, P.A., Attorneys for Defendant, 1601 Belvedere Road, Suite 402, West Palm Beach, FL 33401, this 26th day of February, 2003.

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
**Attorneys for Plaintiffs**
701 Brickell Avenue
Miami, FL 33131
(305) 374-8500
(305) 789-7799(fax)

Craig V. Rasile, Esq., FBN 613691
Jose A. Casal, Esq. FBN 767522
Andrew D. Zaron, Esq., FBN 965790

**CO-COUNSEL**
**FILZER & GRUTTADAURIO**
1414 South Green Road, Suite 101
South Euclid, Ohio 44121
(216) 381-4810
(216) 381-7280 (fax)

MIA1 #1200996 v5

CASE #   *02-CR-60111-WPD*



# "Do Not Scan or Copy This Transcript."

DE #

1

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2               FORT LAUDERDALE DIVISION

 3   UNITED STATES OF AMERICA,   ) CASE NO.   02-60111-CR-WPD
                                 )
 4             Plaintiff,        )
                                 )
 5        -v-                    )
                                 )
 6   DANNY WISHER,              )
     TIMMY COX,                  )
 7   MICHAEL CRUMPTON,          )
                                 ) Fort Lauderdale, Florida
 8             Defendants.       ) December 4, 2002
                                 ) 10:39 a.m.
 9

10           TRANSCRIPT OF TRIAL PROCEEDINGS

11       BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

12                   U.S. DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:      EDWARD N. STAMM, ESQ.
                             ROSA C. RODRIGUEZ-MERA, ESQ.
15                           Assistant U.S. Attorneys

16
     For the Defendant      BRUCE ZIMET, ESQ.
17   Wisher:

18   For the Defendant      KENNETH LIPMAN, ESQ.
     Cox:                   JULIE PRAG VIANALE, ESQ.
19
     For the Defendant       ALVIN ENTIN, ESQ.
20   Crumpton:

21   Reporter:              ROBERT A. RYCKOFF
                            Official Court Reporter
22                          299 East Broward Boulevard
                            Fort Lauderdale, Florida 33301
23                          954-769-5657

24

25
```



EXHIBIT

"A"

# NOT

# SCANNED

**PLEASE REFER TO COURT FILE**

*Research on UCC's filed #9
against the Seminoles.*



# FLORIDA SECURED TRANSACTION REGISTRY

DETAIL RECORD FOR: 20020101063X      < PREVIOUS   BACK TO RESULTS   NEXT >

| STATUS | DATE FILED | EXPIRES | FILINGS COMPLETED THRU | SUMMARY FOR FILING |
|--------|-----------|---------|------------------------|--------------------|
| ACTIVE | 04/30/2002 | 04/30/2007 | 08/16/2002 | 20020101063X |

| Events Filed | 0 |
|--------------|---|

## SECURED PARTIES                         Current Secured Parties: 1
NAME & ADDRESS

WACHOVIA BANK, NATIONAL ASSOCIATION, AS MASTER TRUSTEE
200 S. BISCAYNE BLVD 14TH FL MIAMI FL 33131

MORE >

## DEBTOR PARTIES                          Current Debtor Parties: 1
NAME & ADDRESS

SEMINOLE TRIBE OF FLORIDA
6300 STIRLING ROAD HOLLYWOOD FL 33024

MORE >

## DOCUMENT IMAGES            Pages in all forms/attachments: 14

| DOCUMENT NUMBER | TYPE | DATE | PAGES |
|-----------------|------|------|-------|
| 20020101063X | UCC1 | 04/30/2002 | 14 |

Home || Search || Fees || Forms || FAQ's || Help || Debit

      

Copyright (C) 2001 Image API, Inc.

"COMPOSITE EXHIBIT B"

[object]

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Burt Bruton (305) 579-0593

**B. SEND ACKNOWLEDGEMENT TO:**

Name: Burt Bruton, Esq.
Address: Greenberg Traurig, P.A.
1221 Brickell Avenue
Address: Miami, FL 33131
City/State/Zip:

**FLORIDA SECURED TRANSACTION REGISTRY**

# FILED
2002 Apr 30 AM 12:00

****** 20020101063X ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1a. ORGANIZATION'S NAME   SEMINOLE TRIBE OF FLORIDA |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS 6300 Stirling Road | CITY Hollywood | STATE FL | POSTAL CODE 33024 | COUNTRY USA |

| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Fed. recog. Indian Tribe | 1f. JURISDICTION OF ORGANIZATION USA | 1g. ORGANIZATIONAL ID# ☒ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2a. ORGANIZATION'S NAME |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID# ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)– INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME WACHOVIA BANK, NATIONAL ASSOCIATION, AS MASTER TRUSTEE |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS 200 S. Biscayne Blvd, 14th Fl, Att: Corp Trust Dpt | CITY Miami | STATE FL | POSTAL CODE 33131 | COUNTRY USA |

**4. This FINANCING STATEMENT covers the following collateral:**
Collateral is described in attached Schedule I, Exhibit "A" and Exhibit "B," which are incorporated herein by this reference.

This financing statement is filed under the Uniform Commercial Code, and also under the Secured Transaction Ordinance of the Seminole Tribe of Florida pursuant to Section 285.20 of the Florida Statutes.

---

| 5. ALTERNATE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR |
|---|---|---|---|
| | AG. LIEN | NON-UCC FILING | SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☒ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** To be filed in Florida Secured Transaction Registry

STANDARD FORM - FORM UCC-1 (REV.12/2001)          Filing Office Copy          Approved by the Secretary of State, State of Florida

**SCHEDULE I**
TO FINANCING STATEMENT

Name of Debtor:        SEMINOLE TRIBE OF FLORIDA (the **"Tribe"**)
Address:              6300 Stirling Road
                     Hollywood, Florida 33024

Name of Secured Party: WACHOVIA BANK, NATIONAL ASSOCIATION, AS
                     MASTER TRUSTEE (the **"Master Trustee"**)
Address:              200 S. Biscayne Boulevard, 14th Floor
                     Miami, FL 33131
                     Attention: Corporate Trust Department

Legal descriptions of the **"Tampa Property"** and the **"Hollywood Property"** are set forth in attached Exhibit "A." Capitalized terms used in this Schedule I but not defined herein have the respective meanings set forth in attached Exhibit "B."

## DESCRIPTION OF THE COLLATERAL:

(1)    The Collateral covered by this Financing Statement is all of the Tribe's right, title and interest in, to and under the property described below, whether now owned or hereafter acquired, created or arising, regardless of where such property may be located and whether such property may be in the possession of the Tribe, the Master Trustee, or a third party, and if any of such property may be held or stored with any Person other than the Tribe, together with all of the Tribe's rights now owned or hereafter acquired, created or arising relating to the storage and retrieval thereof and access thereto (all of which property described below and all such rights of storage, retrieval and access being referred to herein as **"Collateral"**):

(A)    All Accounts of the Tribe, and all of its General Intangibles, other than the Tribe Account under the Master Indenture, relating to the Tampa Hollywood Enterprise (including, without limitation, any Competitive Facility); and

(B)    All moneys, securities, investment property and other property, now or hereafter held or received by, or in transit to, the Master Trustee, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and any balances, sums and credits of the Tribe held by the Master Trustee at any time existing and all of the Tribe's deposit accounts at the Master Trustee, including, without limitation, the deposit accounts established pursuant to Section 3.10 of the Master Indenture (other than the Tribe Account), relating to the Tampa Hollywood Enterprise (including, without limitation, any Competitive Facility); and

Schedule I to Financing Statement
Page 1 of 3

(C)     All promissory notes, Chattel Paper, or other instruments or agreements, evidencing the Tribe's right to receive payment from any Person, and including, without limitation, all "instruments" (as defined in the Seminole Tribe's Secured Transaction Ordinance or in Article 9 of the Florida Uniform Commercial Code), relating to the Tampa Hollywood Enterprise (including, without limitation, any Competitive Facility); and

(D)     The Pledged Revenues, the Suspense Account (Hollywood), the Suspense Account (Tampa), the Operating Account, the Lien Repayment Account, the Power Plant Account, the Subordinate Obligation Account, the Gaming Improvement Account, the Construction Account, the Defeasance Account, the Termination and Term-Out Account, the Minimum Distribution Account and all money, instruments, investments, investment property, or other property deposited therein or credited thereto, all for application as provided herein; and

(E)     All Gaming Improvements and all equipment, inventory, goods (as each is defined in the Seminole Tribe's Secured Transaction Ordinance), furniture, furnishings and other tangible personal property of the Tribe relating to the Tampa Hollywood Enterprise, whether or not moved to any other location (including, without limitation, any Competitive Facility) not constituting real property (**"Personal Property"**), whether the Tribe now or hereafter obtains an interest in such Personal Property, and all proceeds and products thereof; and

(F)     All products of Collateral (**"Products"**); and

(G)     All cash and non-cash "proceeds" (as the term is used in Seminole Tribe's Secured Transaction Ordinance or in Article 9 of the Florida Uniform Commercial Code) of the foregoing and all other amounts received in respect of any sale, exchange, lease, license or other disposition of any Collateral or the operation or management of the Tampa Hollywood Enterprise (including, without limitation, any Competitive Facility), including, without limitation, insurance proceeds (**"Proceeds"**), subject to the absolute right of the Tribe to use such insurance proceeds for the repair and/or restoration of the Tampa Hollywood Enterprise as set forth in Section 3.10(12) of the Master Indenture, regardless of whether an Event of Default then or thereafter exists.

(2)     [Intentionally omitted]

(3)     Without limiting the generality of the description of the Collateral set forth in paragraph (1) above, the Collateral includes the following property pertaining to the Tampa Hollywood Enterprise or any Competitive Facility, whether now owned or hereafter acquired, and all Proceeds thereof:

Schedule I to Financing Statement
Page 2 of 3

(A)    All rights of the Tribe or any affiliate as an innkeeper to receive payment for the rental, leasing, hiring, licensing, use or occupancy of any guest room, meeting space, banquet hall or related amenities, including food, beverage and other concessions, at any hotel, motel, inn, resort, convention or conference facility, or other transient lodging facility now or hereafter located at the Tampa Property or the Hollywood Property, including all or any portion of the Project; and

(B)    All rights of the Tribe or any affiliate of the Tribe as an innkeeper to receive payment for the rental, leasing, hiring, licensing, use or occupancy of any guest room, meeting space, banquet hall or related amenities, including food, beverage and other concessions, at any hotel, motel or inn now or hereafter owned, leased and/or operated by the Tribe or any affiliate of the Tribe within five (5) miles of the Tampa Property or the Hollywood Property; and

(C)    All rights of the Tribe or any affiliate as lessor or sublessor to receive payment of any rent, subrent, expense and tax pass-throughs, and other monies due or to become due under a valid lease or sublease, whether now existing or hereafter made, of real or personal property located at the Tampa Property or the Hollywood Property, including all or any portion of the Project; and

(D)    All rights of the Tribe or any affiliate of the Tribe as lessor or sublessor to receive payment of any rent, subrent, expense and tax pass-throughs, and other monies due or to become due under a valid lease or sublease, whether now existing or hereafter made, of any retail operation owned, leased and/or operated by the Tribe or any affiliate of the Tribe that is within one thousand (1,000) feet of the boundaries of the Tampa Property or the Hollywood Property, and that is competitive with, or is of the same general type as the retail facilities of the Tampa Hollywood Enterprise, whether existing or proposed to be operated on or after the date of the Master Indenture excluding, however, any smoke shops, gas stations or any retail operation in existence on the date of the Master Indenture.

EXHIBIT "A"

<u>LEGAL DESCRIPTIONS</u>

**"Tampa Property"**

(Hillsborough County, Florida)

<u>Existing Gaming Facilities and Gaming Improvements Site</u>

All of the East 1/2 of the Northeast 1/4 of Section 2, Township 29 South, Range 19 East, Hillsborough County, Florida, lying North of Interstate 4 and East of Orient Road, being more particularly described as follows:

PARCEL A

Commence at the Northeast corner of said Section 2, thence South 00°28'17" West along the East line of said Section 2 for a distance of 42.78 feet to the point of beginning on the Southerly right-of-way of Hillsborough Avenue (State Road 600); thence continue South 00°28'17" West along the East line of said Section 2 for a distance of 799.21 feet to the Northerly right-of-way of Interstate 4 (State Road 400); thence South 49°12'68" West along said Northerly right-of-way for a distance of 1013.09 feet to a point hereinafter referred to "Point A"; thence North 00°11'46" East for a distance of 547.26 feet; thence North 89°14'33" West for a distance of 526.87 feet to the Easterly right-of-way of Orient Road; thence North 00°00'44" West for a distance of 370.48 feet; thence South 89°58'02" East for a distance of 6.95 feet; thence 01°37'26" East for a distance of 360.14 feet; thence North 00°01'58" East for a distance of 50.00 feet; thence North 02°53'43" East for a distance of 100.13 feet; thence North 00°01'58" East for a distance of 31.81 feet to the Easterly right-of-way of said Hillsborough Avenue (State Road 600), the last six (6) mentioned courses being coincident with the Easterly right-of-way of said Orient Road; thence South 89°45'02" East along the Southerly right-of-way of said Hillsborough Avenue (State Road 600) for a distance of 1275.98 feet to the point of beginning and containing 30.82 acres (1,342,436 square feet), more or less.

TOGETHER WITH:

PARCEL B

Commence at "Point A" as previously described; thence South 49°12'58" West along the Northerly right-of-way of Interstate 4 (State Road 400) for a distance of 633.60 feet to the Easterly right-of-way of Orient Road; thence North 00°00'44" West for a distance of 537.26 feet; thence South 89°68'16" West for a distance of 22.00 feet; thence North 00°00'44" West for a distance of 400.00

Exhibit "A" to Financing Statement
Page 1 of 5

feet; thence South 89°14'33" West for a distance of 23.00 feet; thence North 00°00'44" West for a distance of 30.87 feet, the last five (5) mentioned courses being coincident with the Easterly right-of-way of said Orient Road; thence South 89°14'33" East for a distance of 526.87 feet; thence South 00°11'46" West for a distance of 647.28 feet to the point of beginning and containing 8.59 acres (347,152 square feet), more or less.

### "Hollywood Property"

(Broward County, Florida)

Existing Gaming Facilities

A portion of the East 1/2 of the NW 1/4 of Section 1, Township 51 South, Range 41 East, Broward County, Florida, more particularly described as follow:

Commence at the center of said Section 1, thence run North 1°40'45" West along the East line of the NW 1/4 of said Section 1 for 224.92 feet to the Point of Beginning of the following described parcel of land; thence continue North 1°40'45" West along the last described course for 1072.37 feet; thence run South 88°19'15" West for 414.74 feet; thence run South 1°40'45" East along a line parallel to and 414.74 feet West of as measured at right angles to the East line of the NW 1/4 of the aforementioned Section 1 for 1088.52 feet; thence North 86°05'40" East for 415.05 feet to the Point of Beginning, Subject to Roadway Easement for State Road No. 7.

AND

A portion of the East 1/2 of the NW 1/4 of Section 1, Township 51 South, Range 41 East, Broward County, Florida, more particularly described as follows:

Commence at the Center of said Section 1; thence run North 1°40'45" West along the East line of the NW 1/4 of said Section 1 for 1297.29 feet to the Point of Beginning of the following described parcel of land; thence continue North 1°40'45" West along the last described course for 904.00 feet; thence run South 88°19'15" West for 414.74 feet; thence run South 1°40'45" East along a line parallel to and 414.74 feet West of as measured at right angles to the East line of the NW 1/4 of the aforementioned Section 1 for 904.00 feet; thence North 88°19'15" East for 414.74 feet to the Point of Beginning, Subject to Roadway Easement for State Road No. 7.

Exhibit "A" to Financing Statement
Page 2 of 5

## Gaming Improvements Site

Portions of Tracts 10, 11, 12, 13 and 14 in Section 36, Township 50 South, Range 41 East of John W. Newman's Survey, according to the Plat thereof as recorded in Plat Book 2, Page 26, of the Public Records of Dade County, Florida. Said portions lying within the boundary of the Seminole Tribe of Florida Hollywood Indian Reservation and being more particularly described as follows:

Commence at the Southwest corner of said Section 36; thence along the West line of said Section, also being the West line of said Tract 12, on a grid North bearing (based on the Stoner-Keith Resurvey No. III recorded in Miscellaneous Plat Book 5, Page 9, Broward County Records) of North 02°01'44" West, a distance of 2646.28 feet to the Northwest corner of said Tract 12, also being the West One-Quarter (W1/4) Corner of said Section 36; thence North 87°56'36" East, along the North line of said Tract 12, a distance of 382.37 feet to the Point of Beginning, said point lying on the Easterly right-of-way line of Florida's Turnpike, based on the Right-of-Way Map dated 8-25-55, Contract 1.1; thence continue along the North lines of said Tract 12 and said Tract 11, North 87°56'36" East, a distance of 2234.70 feet, to a point on the West right-of-way line of State Road No. 7, based on the Florida Department of Transportation Right-of -Way Map, Project Section No. 8610-202; thence South 01°52'21" East, along said West right-of-way line, a distance of 216.48 feet to a point of curvature of a 2814.93 foot radius curve concave to the West; thence Southerly along said curve, also being said West right-of-way line, through a central angle of 21°02'55" an arc distance of 1034.11 feet to a point of tangency; thence South 19°10'33" West, along said West right-of-way line, a distance of 102.94 feet to a point on the South line of said Tract 11, said point also know as Reference Point A; thence South 87°55'42" West, along the South line of said Tracts 11 and 12, a distance of 2001.20 feet to a point on the aforesaid East right-of-way line of Florida's Turnpike; thence North 02°14'58" West, along said East right-of-way line, a distance of 1323.36 feet to the Point of Beginning and containing 65.857 acres (2,868,733 square feet), more or less.

TOGETHER WITH a portion of Tracts 10 and 11 of said Section 36 described as follows:

Commence at the aforesaid Reference Point A, said point being at the intersection of the West right-of-way line of said State Road No. 7 and the South line of said Tract 11; thence North 87°55'42" East along the South line of said Tract 11, a distance of 107.29 feet to a point on the East right-of-way line of said State Road No. 7, said point also being the Point of Beginning; thence North 19°10'33" East, along said East right-of way line, a distance of 64.06 feet to a point of curvature of a 2914.93 foot radius curve concave to the West; thence Northerly along said curve, and said East right-of-way line, through a central angle of 07°20'35" an arc distance of 373.57 feet to a point on the West

Exhibit "A" to Financing Statement
Page 3 of 5

right-of-way line of Old State Road No. 7; thence South 01°52'21" East, along said West right-of-way, a distance of 41.06 feet to a point on a 2924.93 foot radius non-tangent curve, concentric to the last described curve and a concave to the West, whose radius point bears North 77°23'08" West; thence Northerly said curve, also being the Northerly boundary of that portion of Old State Road No. 7 vacated and described in Official Records Book 24713, Page 803, Broward County Public Records, through a central angle of 01°11'52" an arc distance of 61.14 feet to a point on the common boundary of said Tracts 10 and 11; thence continue Northerly along said 2924.93 foot radius curve, through a central angle of 01°39'51" an arc distance of 84.96 feet to a point on the centerline of vacated Old State Road No. 7; thence South 01°52'21" East, along the centerline of said vacated Old State Road No. 7, a distance of 516.74 feet to a point on the South line of said Tract 10; thence South 87°58'55" West, along said South line, a distance of 16.95 feet to the Southwest corner of said Tract 10, also being the Southeast corner of said Tract 11; thence South 87°55'12" West, along the South line of said Tract 11, a distance of 150.56 feet to the Point of Beginning and containing 0.925 acres (40,312 square feet), more or less.

TOGETHER WITH a portion of Tract 13:

Commence at the Southwest corner of said Section 36; thence North 75°13'48" East for a distance of 410.43 feet to the Point of Beginning on the intersection of the Northerly right-of-way line of Stirling Road and the Easterly right-of-way line of Florida's Turnpike, based on the Right-of-Way Map dated 08-25-55 Contract 1.1; on a point of a curve, said point bears North 86°14'43" East to the radius point of the next described curve; thence Northwesterly along a circular curve to the right having a radius of 22768.32 feet, a central angle of 01°30'19" for an arc distance of 598.13 feet to a point of tangency; thence North 02°14'58" West for a distance of 634.56 feet to a point on the common line of Tracts 12 and 13, the last two mentioned courses being coincident with the Easterly right-of-way of said Florida's Turnpike; thence North 87°55'42" East, along said common line, for a distance of 273.78 feet; thence South 02°01'15" East for a distance of 1243.89 feet to a point on the Northerly right-of-way of Stirling Road; thence North 87°44'24" West along said Northerly right-of-way for a distance of 8.42 feet; thence North 89°39'16" West along said Northerly right-of-way for a distance of 252.82 feet to the Point of Beginning and containing 7.675 acres (334,300 square feet), more or less.

TOGETHER WITH a portion of Tract 14:

Commence at the North One-Quarter (1/4) corner of Section 1, Township 51 South, Range 41 East; thence South 87°54'14" West along the Northerly line of said Section 1 for a distance of 99.87 feet; thence North 02°05'46" West for a distance of 29.01 feet to the Point of Beginning on the Northerly right-of-way of Stirling Road based on the Right-of-Way Map dated 06/79 Section 86516-

Exhibit "A" to Financing Statement
Page 4 of 5

2602; thence South 87°54'14" West along said Northerly right-of-way for a distance of 252.26 feet; thence North 02°11'30" West along said right-of-way for a distance of 6.00 feet; thence South 87°54'15 West along said right-of-way for a distance of 200.87 feet; thence North 02°07'27" West along the Easterly line of the Baptist Church property for a distance of 1287.13 feet to a point on the common line of Tracts 11 and 14; thence North 87°55'42" East along said common line for a distance of 769.74 feet to a point on the Westerly right-of-way of State Road No. 7 (U.S. 441); thence South 19°10'33" West along said Westerly right-of-way for a distance of 232.43 feet to a point of curvature; thence Southwesterly along a circular curve to the left having a radius of 2914.93 feet, a central angle of 20°57'23" for an arc distance of 1066.16 feet along said Westerly right-of-way; thence South 43°05'16" West for a distance of 49.29 feet to the Point of Beginning and containing 17.210 acres (749,656 square feet), more or less.

Exhibit "A" to Financing Statement
Page 5 of 5

EXHIBIT "B"

DEFINITIONS USED IN FINANCING STATEMENT

**"Account"** has the meaning set forth in the Seminole Tribe's Secured Transaction Ordinance.

**"Chattel Paper"** has the meaning set forth in the Seminole Tribe's Secured Transaction Ordinance.

**"Competitive Facility"** means any of the following that is owned, leased and/or operated by the Tribe or an affiliate of the Tribe: (i) any Gaming operation within fifty (50) miles of the Hollywood Property or the Tampa Property, but excluding any Gaming that is being conducted as of the date of the Master Indenture, or that might subsequently be conducted at any time during the term of the Master Indenture in Coconut Creek, Florida, (ii) any hotel, motel or inn within five (5) miles of the Hollywood Property or the Tampa Property, or (iii) any retail operation that is within one thousand (1,000) feet of the boundaries of the Hollywood Property or the Tampa Property and that is competitive with, or is of the same general type as, the retail facilities of the Tampa Hollywood Enterprise, whether existing or proposed to be opened at any time on or after the date of the Master Indenture; *provided that* Competitive Facility shall not include smoke shops, gas stations or any retail operation in existence on the date of the Master Indenture.

**"Construction Account"** means the account of that name established with the Master Trustee pursuant to the Master Indenture.

**"Defeasance Account"** means the account of that name established with the Master Trustee pursuant to the Master Indenture.

**"Event of Default"** means any of the events specified in Section 4.01 of the Master Indenture.

**"Existing Gaming Facilities"** means the Gaming Facilities operated by the Tribe on the Hollywood Reservation and on the Tampa Reservation as of the date of the Master Indenture. If such Gaming Facilities are moved to any other location on the Hollywood Reservation or the Tampa Reservation, or renovated, rebuilt, expanded or otherwise modified due to casualty damage, condemnation or any other cause whatsoever before all obligations secured under the Master Indenture have been paid in full, the Gaming Facilities at such new locations or renovated, rebuilt, expanded or otherwise modified shall be included in the term "Existing Gaming Facilities."

**"Gaming"** means any and all activities that are or were defined as Class

Exhibit "B" to Financing Statement
Page 1 of 5

II or Class III gaming under the IGRA or any gaming activity authorized under any Compact.

**"Gaming Facilities"** means the Existing Gaming Facilities, the Gaming Improvements and all other facilities, equipment, buildings and improvements for purposes of Gaming that are or become part of the Tampa Hollywood Enterprise.

**"Gaming Improvements"** means new Gaming facilities to be located adjacent to each portion of the Project at the Hollywood Property and the Tampa Property, including, without limitation, expansions, improvements or replacements of the Existing Gaming Facilities and all other Gaming Facilities that are now or hereafter located upon the Hollywood Reservation and the Tampa Reservation or otherwise become part of the Tampa Hollywood Enterprise. If such Gaming Facilities are moved to any other location or renovated, rebuilt, expanded or otherwise modified due to casualty damage, condemnation or any other cause whatsoever before all obligations secured by the Master Indenture have been paid in full, the Gaming Facilities at such new locations as renovated, rebuilt, expanded or otherwise modified shall be included in the term "Gaming Facilities."

**"Gaming Improvement Account"** means the account of that name established with the Master Trustee pursuant to the Master Indenture.

**"General Intangible"** has the meaning set forth in the Seminole Tribe's Secured Transaction Ordinance.

**"Hollywood Property"** means the portion of the Hollywood Reservation where the Existing Gaming Facility is located and the portion of the Hollywood Reservation where the Gaming Improvements and the Project will be located, as more particularly described in attached Exhibit "A", including such portion of the Hollywood Reservation that is reasonably necessary for access to and use of the Existing Gaming Facility, the Gaming Improvements and the Project, such as parking areas used by patrons of the Existing Gaming Facility, the Gaming Improvements and the Project.

**"Hollywood Reservation"** means all Tribe Property, and all Indian Land held in trust by the United States of America for the Tribe, in or near Hollywood, Florida, as the same may be increased from time to time.

**"IGRA"** means the Indian Gaming Regulatory Act of 1988, PL 100-497; 25 U.S.C. §2701 et seq., as it may be amended from time to time.

**"Indian Land"** means (A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States of America for the benefit of any federally recognized Indian Tribe

Exhibit "B" to Financing Statement
Page 2 of 5

or individual or held by any federally recognized Indian Tribe or individual subject to restriction by the United States of America against alienation and over which a federally recognized Indian Tribe exercises governmental power.

"**Lien Repayment Account**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Master Indenture**" means the Master Indenture dated as of March 1, 2002 made by the Tribe in favor of the Master Trustee, as originally executed and as it may from time to time be supplemented, modified or amended in accordance with the terms thereof.

"**Master Trustee**" means Wachovia Bank, National Association, a national banking association and, subject to the limitations contained in the Master Indenture, any other corporation or association that may be co-trustee with the Master Trustee, and any successor or successors to said trustee or co-trustee in the trusts created thereunder.

"**Minimum Distribution Account**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Operating Account**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Person**" means an individual, corporation, firm, association, partnership, trust or other entity or group of entities, including the Tribe or any governmental entity or any agency or political subdivision thereof.

"**Pledged Revenues**" means all income, receipts and revenues from the ownership or operation of the Tampa Hollywood Enterprise, including, without limitation, all income, receipts and revenues from Gaming, from food, beverage and other concessions, from occupancy of guest rooms, from the lease or sublease of space, from conferences and conventions, and from any other activities carried on within, by or through the Tampa Hollywood Enterprise, all receipts of the net proceeds of insurance, condemnation or similar reimbursements received by the Tribe for losses with respect to the Tampa Hollywood Enterprise (subject to Section 3.10(12) of the Master Indenture) and all proceeds of any of the foregoing.

"**Power Plant Account**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Project**" or "**Initial Project**" means the acquisition, construction, equipping and improvement of convention facilities, public lodging, restaurant facilities, entertainment facilities, retail facilities and other ancillary and subordinate facilities related to such convention facilities, all to be acquired,

Exhibit "B" to Financing Statement
Page 3 of 5

constructed, located and installed on the Tampa Property and Hollywood Property, in accordance with plans and specifications on file or to be on file with the "Related Bond Trustee" for the "Initial Project Related Bonds" (as defined in the Master Indenture).  The term "Project" shall not include any Gaming Facilities.

"**Properties**" means the Hollywood Property and the Tampa Property.

"**Seminole Tribe's Secured Transaction Ordinance**" means that Tribal Ordinance No. C-01-01 of the Tribe enacted on August 27, 2001, pertaining to the creation, perfection and priority of security interests.

"**Subordinate Obligation Account**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Suspense Account (Hollywood)**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Suspense Account (Tampa)**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

"**Tampa Hollywood Enterprise**" means the Tampa Hollywood Facilities and the management, accounting, operation, books and records thereof as a separate enterprise activity (but not a separate legal entity) of the Tribe.

"**Tampa Hollywood Facilities**" means the Existing Gaming Facilities, the Gaming Improvements and the Project and any expansions, replacements or improvements thereto.  If any Competitive Facility is opened by the Tribe pursuant to Section 3.09 of the Master Indenture, then such Competitive Facility shall be included in the term "Tampa Hollywood Facilities."

"**Tampa Property**" means the portion of the Tampa Reservation where the Existing Gaming Facility is located and the portion of the Tampa Reservation where the Gaming Improvements and the Project in Tampa, Florida are to be located, as more particularly described in attached Exhibit "A", including such portion of the Tampa Reservation that is reasonably necessary for access to and use of the Existing Gaming Facility, the Gaming Improvements and the Project, such as parking areas used by patrons of the Existing Gaming Facility, the Gaming Improvements and the Project.

"**Tampa Reservation**" means all Tribe Property, and all Indian Land held in trust by the United States of America for the Tribe, in or near Tampa, Florida, as the same may be increased from time to time.

"**Termination and Term-Out Account**" means the account of that name established with the Master Trustee pursuant to the Master Indenture.

Exhibit "B" to Financing Statement
Page 4 of 5

**"Tribe Account"** or **"Tribe Accounts"** means the Tribe Account (Hollywood) and the Tribe Account (Tampa).

**"Tribe Account (Hollywood)"** means the account of that name established with the Master Trustee pursuant to the Master Indenture.

**"Tribe Account (Tampa)"** means the account of that name established with the Master Trustee pursuant to the Master Indenture.

**"Tribe Property"** means any and all rights, titles and interests in and to any and all property of the Tribe, whether real or personal, tangible or intangible and wherever situated, and whether now owned or hereafter acquired.

Exhibit "B" to Financing Statement
Page 5 of 5

NEW ISSUE-BOOK-ENTRY ONLY

RATING:
Series 2002A: not rated
Series 2002C (insured): S&P: A
(See "RATING" herein)

In the opinion of Orrick, Herrington & Sutcliffe LLP, Special Tax Counsel, based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 and is exempt from all present intangible personal property taxes imposed by the State of Florida pursuant to Chapter 199, Florida Statutes. In the further opinion of Special Tax Counsel interest on the Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Special Tax Counsel observed that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. Special Tax Counsel expresses no opinion regarding any other tax consequences related to the ownership or disposition of, or the accrual or receipt of interest on, the Bonds. See "TAX MATTERS."



## $290,000,000
## CAPITAL TRUST AGENCY REVENUE BONDS
## (SEMINOLE TRIBE OF FLORIDA
## CONVENTION AND RESORT HOTEL FACILITIES),
## $260,600,000 SERIES 2002A
## $29,400,000 SERIES 2002C



Dated: Date of Delivery                                          Maturities and Interest Rates As Shown on Inside Cover

The Capital Trust Agency (the "Issuer") is issuing its Revenue Bonds (Seminole Tribe of Florida Convention and Resort Hotel Facilities), Series 2002A (the "Series 2002A Bonds") and its Revenue Bonds (Seminole Tribe of Florida Convention and Resort Hotel Facilities), Series 2002C (the "Series 2002C Bonds" and collectively with the Series 2002A Bonds, the "Bonds"), in fully registered form and will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the Bonds. Purchases of the Bonds will be made only in book-entry form through DTC participants in the denominations of $100,000 and any integral multiple thereof, with respect to the Series 2002A Bonds, and in the denominations of $100,000 and any integral multiple of $5,000 in excess thereof with respect to the Series 2002C Bonds and no physical delivery of the Bonds will be made to purchasers.

The Bonds are being issued pursuant to the provisions of Chapter 163, Part I, et seq., Florida Statutes, Chapter 166, Part II, Florida Statutes, Chapter 159, Part II, Florida Statutes and other applicable provisions of law, that certain interlocal agreement dated August 2, 1999, as amended, creating the Issuer, the Issuer's Articles of Incorporation, as amended, and (1) with respect to the Series 2002A Bonds, a Bond Indenture, dated as of March 1, 2002 (the "Series 2002A Indenture"), between the Issuer and U.S. Bank National Association, as trustee (the "Trustee") and a Loan Agreement, dated as of March 1, 2002 (the "Series 2002A Loan Agreement"), between the Issuer and the Seminole Tribe of Florida, a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934 (the "Tribe") and (2) with respect to the Series 2002C Bonds, a Bond Indenture, dated as of March 1, 2002 (the "Series 2002C Indenture" and together with the Series 2002A Indenture, the "Indentures"), between the Issuer and the Trustee and a Loan Agreement, dated as of March 1, 2002 (the "Series 2002C Loan Agreement" and together with the Series 2002A Loan Agreement, the "Loan Agreement"), between the Issuer and the Tribe. The Issuer will lend the proceeds of the Bonds to the Tribe under the Loan Agreement and the Tribe will use such proceeds, together with the proceeds of the Series 2002B Bonds described herein, (a) to finance and refinance the planning, design, development, construction, installation, equipping and opening of (1) a convention facility with an approximately 250-room full-service four-diamond quality conference hotel and ancillary facilities on the Tribe's reservation located near the City of Hollywood, Florida (the "Hollywood Resort Facilities") and (2) a convention facility with an approximately 250-room full-service four-diamond quality conference hotel and ancillary facilities on the Tribe's reservation located near the City of Tampa, Florida (the "Tampa Resort Facilities" and, together with the Hollywood Resort Facilities, the "Resort Facilities"), (b) to pay capitalized interest during a portion of the construction of the Resort Facilities, (c) to fund separate debt service reserve funds for the Series 2002A Bonds, the Series 2002B Bonds, and the Series 2002C Bonds and (d) to pay certain costs of issuing the Bonds. Power Plant Entertainment LLC (the "Developer") will develop each of the Resort Facilities which will be owned and operated by the Tribe as a "Hard Rock Hotel" in accordance with a license agreement with Hard Rock Cafe International (USA), Inc. ("Hard Rock"). See "THE PROJECT."

As more fully described under the caption "INSURANCE ON THE SERIES 2002C BONDS ONLY" herein, payment of the principal and interest on the Series 2002C Bonds when due will be guaranteed by a bond insurance policy to be issued simultaneously with the delivery of the Series 2002C Bonds by ACA Financial Guaranty Corporation.



SEE THE INSIDE COVER PAGES FOR A BOND MATURITY SCHEDULE AND SUMMARY DESCRIPTION OF CERTAIN MATTERS RELATING TO THE TRIBE AND THE BONDS.

A federal task force (that includes representatives of the Internal Revenue Service, the Bureau of Indian Affairs, the Federal Bureau of Investigation, the U.S. Attorneys' Office and the Justice Department) is investigating certain activities of the Tribe, the Tribal Council, certain members of the Tribe and/or certain individuals and entities associated with the Tribe. The Tribe has received several federal grand jury subpoenas concerning the same. In addition, the Tribal Council of the Tribe initiated an internal financial investigation into the investment and use of Tribal funds due to allegations of mismanagement and misappropriation of Tribal assets. As a result of these and certain other allegations, the Tribal Council in May 2001 suspended James E. Billie from his position as the Chairman of the Tribal Council, a position he had held for the past 21 years. See "RISK FACTORS" for a discussion of the pending federal government investigations and the pending internal financial investigation of the Tribe.

THE BONDS HAVE NOT BEEN AND WILL NOT BE REGISTERED BY THE ISSUER UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER ANY STATE SECURITIES LAWS, WILL NOT BE LISTED ON ANY SECURITIES EXCHANGE, AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED EXCEPT TO "QUALIFIED INSTITUTIONAL BUYERS" WITHIN THE MEANING OF RULE 144A OF THE SECURITIES ACT OR IN THE CASE OF THE INITIAL PLACEMENT TO "ACCREDITED INVESTORS" WITHIN THE MEANING OF REGULATION D OF THE SECURITIES ACT. PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT SELLERS OF THE BONDS MAY BE RELYING ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A. FOR A DESCRIPTION OF CERTAIN RESTRICTIONS ON TRANSFER SEE "NOTICE TO INVESTORS IN THE BONDS" AND "TRANSFER RESTRICTIONS" HEREIN FOR CERTAIN RESTRICTIONS ON TRANSFERS OF THE BONDS.

THE BONDS SHALL NEVER CONSTITUTE AN INDEBTEDNESS OF THE STATE OF FLORIDA (THE "STATE"), THE LOCAL AGENCIES (AS DEFINED HEREIN) OR ANY AGENCY, DEPARTMENT OR POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND SHALL NEVER CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OR AN OBLIGATION (LEGAL, MORAL OR OTHERWISE) OF THE STATE. THE LOCAL AGENCIES OR ANY AGENCY, DEPARTMENT OR POLITICAL SUBDIVISION OF THE STATE OR A CHARGE AGAINST THE GENERAL CREDIT OR TAXING POWER OF THE STATE, THE LOCAL AGENCIES OR ANY AGENCY, DEPARTMENT OR POLITICAL SUBDIVISION OF THE STATE. THE ISSUER HAS NO TAXING POWERS.

NONE OF HARD ROCK, THE DEVELOPER OR ANY OF THEIR RESPECTIVE AFFILIATES IS RESPONSIBLE IN ANY WAY FOR THE REPAYMENT OF THE BONDS. NONE OF HARD ROCK, THE DEVELOPER OR ANY OF THEIR RESPECTIVE AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES, SHALL, IN ANY WAY BE DEEMED AN "ISSUER" OR "UNDERWRITER" OF THE BONDS AND HARD ROCK, THE DEVELOPER, THEIR AFFILIATES AND SAID OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES HAVE NOT ASSUMED AND SHALL NOT HAVE ANY LIABILITY OR RESPONSIBILITY FOR ANY FINANCIAL STATEMENTS OR OTHER INFORMATION CONTAINED IN THIS LIMITED OFFERING MEMORANDUM.

The Series 2002A Bonds are not rated and represent risk that may not be appropriate for some investors. This cover page contains information for quick reference only. It is not a summary of this bond issue. Potential investors must read the entire Limited Offering Memorandum to obtain information essential to making an informed investment decision.

The Bonds are offered when, as and if delivered to and received by the underwriter named below (the "Underwriter"), in their capacity as Underwriters, or, in the case of the initial purchases to accredited investors, when such Underwriter delivers the Bonds as placement agent to certain institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act (the "Institutional Accredited Investors"), and certain individual "accredited investors" as defined in Rule 501(a)(5) or (6) under the Securities Act ("Individual Accredited Investors"), subject to the approval of validity by Miller, Canfield, Paddock & Stone, P.L.C., Bond Counsel and Orrick, Herrington & Sutcliffe LLP, Special Tax Counsel and certain other conditions. Certain other legal matters will be passed upon for the Issuer by Mark E. Dunahower, P.A.: for the Tribe by Greenberg Traurig, P.A. and Eric Dorsky, P.A.: for Underwriters by Orrick, Herrington & Sutcliffe LLP and Meyer, Brown, Rowe & Maw; for the Developer by Latham & Watkins, Carlton Fields, P.A. and Bilzin, Sumberg, Dunn, Baena, Price & Axelrod LLP, P.A.: and for the initial investors by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and Ropes & Gray. It is expected that the Bonds will be available for delivery through DTC on or about May 1, 2002.

## Merrill Lynch & Co.
*for the Series 2002A Bonds*

April 22, 2002

## JPMorgan
*for the Series 2002C Bonds*



EXHIBIT
"C"

This Limited Offering Memorandum and its distribution have been authorized by the Issuer and approved by the Tribe. This Limited Offering Memorandum is not to be construed as a contract or agreement between the Issuer and the Tribe and any purchaser, owner or holder of any Bond.

CAPITAL TRUST AGENCY


By: /s/ J. Lance Reese
                              Chair

Approved:

THE SEMINOLE TRIBE OF FLORIDA


By: /s/ Max B. Osceola, Jr.
                Authorized Representative

121

**Plan of Finance for the Gaming Facilities**

Concurrently with the construction of the Resort Facilities, the Tribe will finance, through an initial deposit on the date the Bonds are issued of $15,000,000 (which amount will not be from proceeds of the Bonds) and subsequent monthly deposits of available Pledged Revenues (as defined herein) to the Master Trustee (as defined herein) in the amount of $2,000,000 per month (until the total equals $36,000,000) into a trust fund held under the Master Indenture (as defined herein), the planning, design, development, construction, installation, equipping and opening of (1) an approximately 115,000 square foot gaming facility on the Tribe's reservation located near the City of Hollywood, Florida (the "Hollywood Gaming Facilities") and (2) an approximately 90,000 square foot gaming facility on the Tribe's reservation located near the City of Tampa, Florida (the "Tampa Gaming Facilities" and, together with the Hollywood Gaming Facilities, the "Gaming Facilities"). The Developer will develop each of the Gaming Facilities which will be owned and operated by the Tribe. See "PLAN OF FINANCE AND ESTIMATED SOURCES AND USES OF FUNDS" and "THE PROJECT." Once completed, the Gaming Facilities will replace the existing gaming facilities on the Tribe's reservations near Hollywood and Tampa, Florida (separately, the "Existing Hollywood Gaming Facilities" and the "Existing Tampa Gaming Facilities" and together, the "Existing Gaming Facilities"). None of the proceeds of the Bonds or the Series 2002B Bonds will be used for the Gaming Facilities. See "THE EXISTING GAMING FACILITIES."

If Pledged Revenues are insufficient to make the required transfers to finance the Project and the Gaming Facilities, the Tribe is obligated to complete the Gaming Facilities and Resort Facilities from other Tribal funds. In addition, the Tribe covenants in the Loan Agreement to complete or cause the completion of the Gaming Facilities and Resort Facilities and to pay at its own expense all costs of completing the Gaming Facilities and Resort Facilities.

**Security for the Bonds**

The Series 2002A Bonds are special, limited obligations of the Issuer secured under the provisions of the Series 2002A Indenture and the Series 2002A Loan Agreement and will be payable solely from Loan Repayments made by the Tribe under the Series 2002A Loan Agreement, from payments made on an obligation issued by the Tribe pursuant to the Master Indenture ("Senior Obligation No. 1") and from certain funds held under the Series 2002A Indenture. The Tribe is issuing Senior Obligation No. 1 under a Master Indenture, dated as of March 1, 2002 (the "Master Indenture"), between the Tribe and Wachovia Bank, National Association, as master trustee (the "Master Trustee") pursuant to a supplement thereto ("Supplement No. 1") to secure the Tribe's obligations under the Series 2002A Loan Agreement. The Loan Repayments under the Series 2002A Loan Agreement (and therefore the payments on Senior Obligation No. 1) are required to be in an amount sufficient to pay when due the principal of and premium, if any, and interest on the Series 2002A Bonds.

The Series 2002C Bonds are special, limited obligations of the Issuer secured under the provisions of the Series 2002C Indenture and the Series 2002C Loan Agreement and will be payable solely from Loan Repayments made by the Tribe under the Series 2002C Loan Agreement, from payments made on an obligation issued by the Tribe pursuant to the Master Indenture ("Senior Obligation No. 3A") and from certain funds held under the Series 2002C Indenture. The Tribe is issuing Senior Obligation No. 3A under the Master Indenture pursuant to a supplement thereto ("Supplement No. 3") to secure the Tribe's obligations under the Series 2002C Loan Agreement.

4

FEB-26-2003  15:44   HOLLAND AND KNIGHT   P.05

$290,000,000
**CAPITAL TRUST AGENCY REVENUE BONDS**
**(SEMINOLE TRIBE OF FLORIDA**
**CONVENTION AND RESORT HOTEL FACILITIES),**
**$260,600,000 SERIES 2002A**
**$29,400,000 SERIES 2002C**

The following information supplements the summary information set forth on the cover page of this Limited Offering Memorandum.

Concurrently with the construction of the Resort Facilities, the Tribe will fund, through an initial deposit of $15,000,000 on the date of the issuance of the Bonds (which amount will be from separate funds of the Tribe and not proceeds of the Bonds), and subsequent monthly transfers of available Pledged Revenues (as defined herein) in the amount of $2,000,000 per month (until the total equals $36,000,000) to the Master Trustee (as defined herein) for deposit into a trust fund held under the Master Indenture (as defined herein), the planning, design, development, construction, installation, equipping and opening of (1) an approximately 115,000 square foot gaming facility on the Tribe's reservation located near the City of Hollywood, Florida (the "Hollywood Gaming Facilities") and (2) an approximately 90,000 square foot gaming facility on the Tribe's reservation located near the City of Tampa, Florida (the "Tampa Gaming Facilities" and, together with the Hollywood Gaming Facilities, the "Gaming Facilities"). The Developer will develop each of the Gaming Facilities, which will be owned and operated by the Tribe. Once completed, the Gaming Facilities will replace the existing gaming facilities on the Tribe's reservations near Hollywood and Tampa (the "Existing Gaming Facilities"). None of the proceeds of the Bonds will be used for the Gaming Facilities. See "THE PROJECT" and "THE EXISTING GAMING FACILITIES."

Interest on the Bonds is payable on October 1, 2002 and semiannually thereafter on April 1 and October 1 of each year. Payments of principal, premium, if any, and interest will be made to purchasers by DTC through its participants.

**The Bonds are subject to optional, extraordinary optional and mandatory redemption prior to their respective stated maturities, as described herein.**

The Series 2002A Bonds are special, limited obligations of the Issuer secured under the provisions of the Series 2002A Indenture and the Series 2002A Loan Agreement, and will be payable solely from Loan Repayments made by the Tribe under the Series 2002A Loan Agreement, from payments made on Senior Obligation No. 1 (as defined herein) and from certain funds held under the Series 2002A Indenture. The Tribe is issuing Senior Obligation No. 1 under and pursuant to the terms of the Master Indenture, as described herein, to secure the Tribe's obligations under the Series 2002A Loan Agreement. The Series 2002C Bonds are special, limited obligations of the Issuer secured under the provisions of the Series 2002C Indenture and the Series 2002C Loan Agreement, and will be payable solely from Loan Repayments made by the Tribe under the Series 2002C Loan Agreement, from payments made on Senior Obligation No. 3 (as defined herein) and from certain funds held under the Series 2002C Indenture. The Tribe is issuing Senior Obligation No. 3 under and pursuant to the terms of the Master Indenture, as described herein, to secure the Tribe's obligations under the Series 2002C Loan Agreement.

# Seminole Tribe
## of Florida

COUNCIL

JAMES E. BILLIE
Chairman

MITCHELL CYPRESS
Vice Chairman

PRISCILLA D. SAYEN
Secretary - Treasurer

REPRESENTATIVES

DAVID R. CYPRESS
Big Cypress

JACK SMITH, JR.
Brighton

MAX OSCEOLA, JR.
Hollywood

ELAINE J. AGUILAR
Immokalee (n.v.)

January 7, 2000

Penny J. Coleman
Deputy General Counsel
National Indian Gaming Commission
1441 L Street, N.W., 9th Floor
Washington, D.C. 20005

RE:  TRANSACTION DOCUMENTS ENTERED INTO BY
     AND BETWEEN SEMINOLE TRIBE OF FLORDIA
     AND COCONUT CREEK GAMING, L.P.

Dear Ms. Coleman:

This letter is in response to your correspondence of December 21, 1999, which raised certain questions with respect to the various Transaction Documents entered into by and between the Seminole Tribe of Florida ("Tribe") and Coconut Creek Gaming, L.P. ("NORAM") and submitted to the National Indian Gaming Commission ("NIGC"). The submitted documents included the Transaction Summary Agreement, the Ground Lease, the Cash Management Agreement, the Phase I Structure and Equipment Lease, and the Phase II Structure and Equipment Lease. These represent all of the agreements between the parties.

The NIGC has raised a concern that Article VIII of both the Phase I and Phase II Structure and Equipment Lease Agreements provide an opportunity for NORAM to control part of the gaming operation. This is not correct. NORAM is providing the funding to construct the facility and make the same operational. As with any commercially reasonable business transaction, the entity providing the funding is granted a security interest in the structure and equipment. Article VIII simply provides NORAM with the right to inspect the facility and equipment to ascertain that their security is being properly maintained, and if not, have the equipment or facility properly repaired. While a typical security agreement would provide such rights for the lender, the same would require the borrower to bear the cost of the same. In this

EXHIBIT

"D"

To: Penny J. Coleman
January 7, 2000

Page 2

instance, the cost of repair or maintenance will be deemed an operating expense of the facility. Please note that Article VIII does not conflict with the terms of Article VII, which grants the Tribe the exclusive use and control of the facility, in that Section 7.1 provides for this exclusive right provided that the Tribe is not in default of any of the provisions of the Transaction Documents. Section 6.1 of both the Phase I and Phase II Leases provides that the Tribe has an obligation to properly maintain the equipment and the facility. Accordingly, NORAM's right to protect its security only vests if the Tribe is in default of its obligations.

The NIGC's next concern relates to the compensation to be paid by NORAM. The NIGC notes that the Equipment Lease provides for a "base rent" as well as an "incentive rent," the same being 35% of net revenue from all receipts of the facility operation. Please note that the "base rent" is not compensation to be paid to NORAM. Rather, the "base rent" is the vehicle in which the Tribe will reimburse NORAM the cost of construction and start-up expenses. The Transaction Documents require NORAM to provide all of the funding necessary to construct and make the facility operational, at no financial risk to the Tribe. The "incentive rent" provisions of the Agreement set forth the manner in which NORAM will be compensated for the substantial financial risk undertaken.

With respect to the seven (7)-enumerated questions raised by the NIGC, the Tribe responds as follows:

1. Do the documents submitted to the NIGC represent the entire agreement between the parties regarding development, operation, and management of the facility? If not, please provide all other documents that define the entire agreement.

Answer

The documents provided to the NIGC, and as listed in the opening paragraph above, constitute the entire agreement between the parties regarding the development, operation, and management of the facility. There are no other documents or agreements with respect to the same.

2. Is there an understanding that NORAM will identify, hire, or approve the hiring of the general manager or other principal management officials?

To: Penny J. Coleman
January 7, 2000

Page 3

Have senior managers been employed or placed
under contract or manage the proposed facility?

Answer

There is no agreement or understanding with any entity that
NORAM will have any role in identifying, hiring, or
approving the hiring of the general manager or other
principal management officials for the facility. These
decisions lie solely with and will be made exclusively by
the Tribe. The Tribe has appointed Jo-Lin Osceola, an
enrolled member of the Tribe, as the general manager for
the facility.

3.    Will NORAM offer technical advice or consulting
      services in the operation of the facility? Is this
      agreement or understanding set forth in any written
      document? If so, please provide the document or
      documents?

Answer

The Tribe is solely responsible for the operation of the
gaming facility and NORAM will not offer technical advice
or consulting services, nor is there any agreement or
understanding for the same.

4.    What is the right or ability of NORAM to direct
      changes to the operating expense budget and/or
      capital reserve budget that are submitted for its
      review? If there is not such a right or ability, then
      what is the purpose of the review?

Answer

NORAM will have no ability to direct changes to the
operating expenses budget and/or the capital reserve
budget. The purpose of budget review is to provide a
mechanisms where NORAM and the depository will be
apprised of the amount of the pledged revenues which must
be set aside for the payment of operating expenses so that
NORAM can anticipate its revenues for the month and
verify that the amounts received correspond to the amounts
owed. The purpose of providing a copy of the capital
reserve budget is to provide NORAM with evidence that

To: Penny J. Coleman
January 7, 2000

Page 4

capital expense items are not included in and accounted for as operating expenses.

5.    What degree of control is expected or implied by payment to NORAM of 35% of the net revenues for an indefinite period after Phase I facility financing has been repaid and after the Phase II facility has been fully funded.

Answer

No degree of control is expected or implied by payment to NORAM of 35% of the net revenue. Further, the payment of a percentage of the net revenue is not for an indefinite period of time. Rather, the payment of the percentage rent will terminate on the 10th anniversary of the Phase II Commencement Date, assuming that the second Phase is actually developed. In the event Phase II is not developed, the percentage rent will terminate on the 10th anniversary of the Phase I Commencement Date.

6.    Have all exhibits been property attached to the Transaction Documents? If not, please submit any missing documents, including a listing of any equipment NORAM will be leasing to the Tribe.

Answer

A complete set of all exhibits will be provided by NORAM.

7.    What interest in the Tribe's trust lands does NORAM purport to have? Are there trust documents that were not submitted with the Transaction Documents? If so, please submit them.

Answer

NORAM does not have any present interest in the Tribe's trust lands. The Tribe and NORAM have entered into a Ground Lease, which has been submitted to the Bureau of Indian Affairs for approval. Once approved, NORAM will have a leasehold interest in the Tribe's Coconut Creek trust property, subject to and in accordance with the provisions of the Ground Lease. The Ground Lease is meant to serve

To: Penny J. Coleman
January 7, 2000

Page 5

solely as a security interest, guaranteeing the Tribe's performance of the obligations assumed under the Phase II Lease. There are no other trust documents related to the Transaction Documents.

We hope that the above fully addresses the NIGC's concerns. Please do not hesitate to contact us should the NIGC require any additional information.

Sho Naa Bisha

James E. Billie
Chairman of the Tribal Council

JEB/cod
cc:    Jim Shore, Esq.
       Paul Filzer, Esq.

jebtcpjcdgcnigcnoram1-7-00.ltr



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Eastern Area Office
Suite 260
3701 North Fairfax Drive
Arlington, Virginia 22203

IN REPLY REFER TO:

### SECTION 81 APPROVAL

The **SEMINOLE TRIBE OF FLORIDA**, a sovereign Indian nation has submitted certain documents to the Department of the Interior, Bureau of Indian Affairs, for its review, and has requested its approval pursuant to 25 U.S.C. Section 81.

The documents that were reviewed are:

Transaction Summary Agreement

Master Definitions, dated August 4, 1999

Ground Lease by and between Seminole Tribe of Florida and Coconut Creek Gaming, L.P.

Cash Management Agreement by and among Seminole Tribe of Florida and Coconut Creek Gaming, L.P. and U.S. Bank Trust National Association

Phase I - Structure and Equipment Lease Agreement by and between Seminole Tribe of Florida and Coconut Creek Gaming, L.P.

Phase II - Structure and Equipment Lease Agreement by and between Seminole tribe of Florida and Coconut Creek Gaming, L.P.

Additionally, a comprehensive review and analysis was made of the Municipal Service Provider Agreement, which included:

Legal description of Tract 65

Warranty Deed for Tract 65, dated February 25, 1983

Affidavit from Mr. Bill D. Ott, Area Director, Eastern Area, Bureau of Indian Affairs, dated July 25, 1983, and memorandum of May 13, 1983, place Tract 65 land into trust status on behalf of the Seminole Tribe of Florida.



**EXHIBIT**

"E"

Tract 65 Site Plan

City of Coconut Creek, Water and Wastewater Agreement

Right-of-Way Grant for Drainage Easement on Tract 65, United States Department of the Interior, Bureau of Indian Affairs.

Calculation of Consumer Price Index based on Bureau of Labor Statistics Data

Seminole Tribe of Florida, Tribal Council resolution No. C-42-00, Municipal Service Provider Agreement between the Seminole Tribe of Florida and the City of Coconut Creek

Resolution No. 99-141, A resolution of the City Commission of the City of Coconut Creek, Florida, authorizing the City Manager to Execute the Agreement between the City and the Seminole Tribe of Florida, for the Provision of Municipal Services to a 4.886 acre parcel of land held in trust for the Seminole tribe of Florida by the United States.

The Department has reviewed these documents. .

Subject to: (1) Section 1.3, page 3, being amended to remove the word "exclusive;" and (2) Section 4.1, page 16, being amended to include the provision "(other than real property)" after the word "property" on line 13, on behalf of the Seminole Tribe of Florida, this Municipal Service Provider Agreement is approved Pursuant to 25 U.S.C.81.

DELEGATION OF AUTHORITY:

209 DM 8, Secretary's Order Nrs. 3150 and 3177, Amendment No. 3, dated December 16, 1996, and 10 BIAM Bulletins 13, 9402, 9602, and 9801, as amended.

*Franklin Keel, Eastern Regional Director*     February 3, 2000
UNITED STATES DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs

Witness:

F. V. Hudzik, Notary Public     February 3, 2000
Commonwealth of Virginia
My Commission expires August 31, 2000



**NATIONAL**
**INDIAN**
**GAMING**
**COMMISSION**

JAN 2 4 2000

James E. Billie
Tribal Chairman
Seminole Tribe of Florida
6300 Stirling Road
Hollywood, FL 33024

Dear Chairman Billie:

I respond to your letter of September 20, 1999, in which you request NIGC review of various transactional documents associated with the Tribe's new Coconut Creek gaming facility, and to your letter of January 12, 2000, requesting an expedited review. Thank you for your letter of January 7, 2000. The information was useful in our review of the documents.

The NIGC remains concerned with the rate of compensation provided by "incentive rent" and the implications of such a payment. As your letter of January 7, 2000, indicates, the "base rent" is the manner through which Coconut Creek Gaming, L.P., will be repaid for its financial contribution toward the development and construction of the facility. This is calculated as the cost of construction and development plus interest. The purpose and derivation of the "incentive rent" remains unclear. Your letter explains that this payment is intended as compensation for the "risk" that Coconut Creek Gaming has undertaken in developing the facility but avoids any admission that Coconut Creek Gaming will position itself in an oversight capacity for the operation of the facility. The "incentive rent" is, in effect, a "65/35 split" of net revenues between the Tribe and Coconut Creek Gaming for a period of ten years. There is clear and unmistakable motivation for Coconut Creek Gaming to have a voice in control of the operation based on this shared profit arrangement. Even press accounts on the progress of municipal approval for the facility describe NORAM, represented to be the principal partner in Coconut Creek Gaming, L.P., as the company "that will operate the facility."

As I am sure you are aware, the amount of shared net revenue for Coconut Creek Gaming under the agreement is in excess of what would be permitted under NIGC regulations for a management contact without meaningful justification for the excessive fee provided. The term for which these payments are to be made exceeds the length that could be approved in a management contact under any circumstance.

Assuming no management role for Coconut Creek Gaming or NORAM as you say, then perhaps the true characterization of the relationship is one of partnership with the Tribe. The arrangement by which the Tribe shares its "net revenues" with Coconut Creek Gaming may then violate Section 6-1 of the Tribe's own gaming ordinance which provides that the Tribe shall have the sole proprietary interest in any gaming operation.

**EXHIBIT**

"F"

Based on the information available, and despite your stated intention to open the facility on January 28, 2000, the NIGC is not prepared at this time to conclude that the transaction documents submitted with your letter of September 20, 1999 either do or do not constitute a management contract. While there are not explicit terms for management, the conduct of the parties may provide insight into their intent. We will continue to evaluate the matter as an enforcement issue.

As a further matter, the gaming equipment being provided by Coconut Creek Gaming for Phase I has not been identified, as requested. We received only an indication that the equipment was "Class II Electronic Machines (485) Manufactured by Cadillac Jack, Inc." without further description. The NIGC has not issued an advisory opinion for any electronic machines developed by Cadillac Jack, Inc. In the view of the NIGC, a contract for the installation and operation of Class III equipment in the facility would be void.

Finally, in telephonic inquiries, the Delaware Division of Corporations did not confirm the existence of Coconut Creek Gaming, L.P., as either a corporation or a limited partnership registered in the State of Delaware. Your transaction documents state that Coconut Creek Gaming, L.P., is a "Delaware Limited Partnership." Please provide a copy of the partnership filing for this entity, if it exists, including a listing of all partners.

Sincerely,

Penny J. Coleman
Deputy General Counsel

Cc:
Alan Ginsburg, Coconut Creek Gaming, L.P
Paul N. Filzer, Esq.
Director of Enforcement, NIGC

EXHIBIT

"G"

UNITED STATES DISTRICT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-61442-CIV DIMITROULEAS
MAGISTRATE JUDGE SELTZER

COCONUT CREEK GAMING, L.P.,
    a Delaware limited partnership,

Plaintiff,

    vs.

SEMINOLE TRIBE OF FLORIDA,
    a federally recognized Indian Tribe,

Defendant.

_____/

### *AFFIDAVIT OF TIMMY W. COX*

I, Timmy W. Cox, being first duly sworn, depose and say as follows:

1.    Between **October 1999** and **May 2001** I served as the Operations Officer of the Seminole Tribe of Florida (the "Tribe"). As the Tribe's Operations Officer, my direct and immediate supervisor was James E. Billie, Chairman of the Tribal Council of the Seminole Tribe of Florida. My duties as the Tribal Operation Officer included, without limitation: (a) corresponding and communicating with various federal agencies, including without limitation, the National Indian Gaming Commission (the "NIGC") and the Bureau of Indian Affairs, United States Department of the Interior (the "BIA"); and (b) negotiating the terms and provisions of all contracts relating to the Tribe's Gaming Facilities.

2.    On September 10, 1999, the Tribe and Coconut Creek Gaming, L.P. ("CCG") entered into a series of agreements (the "Original Agreements") pursuant to which CCG agreed to construct and develop a gaming facility (the "Gaming Facility") on trust lands in the City of Coconut Creek, Florida (the

"City").

2.     On September 10, 1999, the Tribe also entered into a Municipal Service Provider Agreement with the City (the "MSP Agreement") pursuant to which the City agreed to provide water and waste water services to the Gaming Facility. The MSP Agreement was conditioned upon approval by the BIA.

3.     CCG finished construction of the Gaming Facility in the last week of January. The City, however, refused to allow the Tribe to connect the Gaming Facility to the City's water and wastewater system because that the Tribe had not secured BIA approval of the MSP Agreement. As a result, the Tribe could not open the Gaming Facility to the public.

4.     On January 31, 2000, Chairman Billie instructed me to travel to Washington, D.C. to meet with the Director of the BIA's Eastern Regional Office, Franklin Keel, ("Keel"), to secure the immediate approval of the MSP Agreement by the BIA so that the Tribe could open the Gaming Facility.

5.     On February 1 and February 2, 2000, I met with Keel, along with his Realty Officer, Ronald Walker ("Walker"). Keel and Walker advised me that they had reviewed the Original Agreements and that BIA approval of the Original Agreements was not necessary for them to be valid and binding contracts under the relevant federal statutes. Keel and Walker also advised me that the Tribe would not need to obtain BIA approval of the MSP Agreement if there were certain minor changes to the MSP Agreement. The City's attorney agreed to make these minor changes.

6.     Thereafter, on February 7, 2000, the Gaming Facility opened to the general public.

7.     In April 2000, CCG approached Billie requesting certain modifications to the Original Agreements. Chairman Billie instructed me to

work with CCG to address its concerns, and if appropriate, the amend the Original Agreements.  During April and May 2000, the Tribe's counsel, Eric Dorsky, Esq., ("Dorsky"), worked with CCG to amend the Original Agreements. On June 3, 2000, the Partnership presented the Tribe with a set of substitute agreements relating to the Gaming Facility (the "Substitute Agreements").   I provided full and accurate copies of the Substitute Agreements to each member of the Tribal Council and to the Tribe's General Counsel, James Shore.

8.  On June 28, 2000, the Tribal Council voted to approve the Substitute Agreements and authorized Billie to execute them on behalf of the Tribe.

9.   Immediately after the Tribal Council meeting on June 28, 2000, Billie, Dorsky, CCG's President, Alan Ginsburg ("Ginsburg"), and I went to Billie's Office and witnessed Billie and Ginsburg execute the Substitute Agreements.

10.   After Billie and Ginsburg executed the Substitute Agreements, Dorsky advised Billie and me that he had prepared a package for Billie to mail to the NIGC requesting the NIGC to review the Substitute Agreements and confirm that the Substitute Agreements did not constitute a management agreement under 25 U.S.C. 2701 et seq. (the "IGRA").

11.  Dorsky requested permission to place the package containing the Substitute Transaction Documents in Billie's outgoing mail box, and Billie granted the request.  I witnessed Dorsky place the package in Billie's outgoing mailbox.

12.   In mid-July 2000, I received a telephone call from the Deputy Director of the Tribe's Gaming Commission, Ron Padgett, ("Padgett").   He advised me that he had received a telephone call from Cindy Altimus ("Altimus") from the NIGC regarding the Substitute Agreements and transferred

the telephone call to my office.   I then spoke with Altimus regarding the Substitute Agreements.

13.   During this telephone call, Altimus advised me that (a) the NIGC had received the Substitute Agreements from the Tribe; (2) the NIGC's initial review of the Substitute Agreements indicated that they were virtually identical to the Original Agreements which the NIGC had previously reviewed; and (3) because  the Substitute Agreements were virtually identical to the Original Agreements, the letter the NIGC sent to the Tribe in January, 2000, regarding the NIGC's position on the Original Agreements remained the NIGC's position on the Substitute Agreements.

*Further,* affiant sayeth naught.

*Timmy Wayne Cox*


*State of Florida*

*County of Broward*

Before me did personally appear Timmy Wayne Cox who is known to me and did affirm and say that the matters set forth above are true and correct as to his own personal knowledge. This 27th Day January, 2003

Notary Public  My commission expires _____

Robert O. Saunooke
Commission #DD173215
Expires: Dec 22, 2006
Bonded Thru
Atlantic Bonding Co. Inc.

FROM :
01/27/2003   17:54      8639831448         HCSU ULMMISIUN     Jan. 27 2003 04:55PM   P6

FROM :                          FAX NO. :              Jan. 27 2003 04:55PM   P1

UNITED STATES DISTRICT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-61442-CIV DIMITROULEAS
MAGISTRATE JUDGE SELTZER

COCONUT CREEK GAMING, L.P.,
    a Delaware limited partnership,

Plaintiff,

    vs.

SEMINOLE TRIBE OF FLORIDA,
    a federally recognized Indian Tribe,

Defendant.

_____/

### *AFFIDAVIT OF RON PADGETT*

I, Ron Padgett, being first duly sworn, depose and say as follows:

1.    Between *1999* and *2002* I served as the Deputy Director of the Tribal Gaming Commission of the Seminole Tribe of Florida (the "Gaming Commission"). The Gaming Commission was the primary regulatory authority with oversight responsibility for the Tribe's Gaming Facilities. The Gaming Commission was also the primary point of contact between the Tribe and the National Indian Gaming Commission (the "NIGC"), the federal agency responsible for the regulation of tribal gaming under 25 U.S.C. 2701 et seq. (the "IGRA").

2.    In mid-July 2000, I received a telephone call from Cindy Altimus, ("Altimus"), the NIGC field representative for the Tribe. Altimus advised me that: (a) the NIGC had received the substitute transaction documents between



**EXHIBIT**
"H"

FROM : Case 0:02-cv-61442-WPD   Document 40   Entered on FLSD Docket 02/27/2003   Page 61 of 61
01/27/2003  17:54   003503   6   FAX NO. :   Jan. 27 2003 04:56PM P7

FROM :                                  FAX NO. :                    Jan. 27 2003 04:53PM P2

the Tribe and Coconut Creek Gaming, L.P., ("CCG"), that were executed in June, 2000 (the "Substitute Agreements"); (b) the Substitute Agreements were virtually identical to the original transaction documents between the Tribe and CCG (the "Original Agreements") that were executed in September, 1999, and which were previously submitted to the NIGC; and (c) consequently, the NIGC's position on the Substitute Agreements would remain the same as its position on the Original Agreements.

3. I explained to Altimus that I had not been involved in the negotiation, execution or submission of the Substitute Agreements and that the appropriate person for her to speak with was Tim Cox, ("Cox"), the Tribal Administrator. I then transferred Altimus to Cox.

*Further,* affiant sayeth naught.

**Ron Padgett**

STATE OF FLORIDA

COUNTY OF BROWARD

Before me did personally appear Ron Padgett who is known to me and did affirm and say that the matters set forth above are tru and correct as to his own personal knowledge. This 27th Day January, 2003

Notary Public                    My Commission Expires _____